UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ARMANDO COLON,

                                             Plaintiff,

            vs.                                                        9:05-CV-129
                                                                       (TJM/GJD)
GLENN S. GOORD, et al.,

                                             Defendants.

_____

ARMANDO COLON
82-A-3397
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021
Plaintiff *pro se*

Office of the New York State Attorney General          Maria Moran, Esq.
615 Erie Boulevard West, Suite 102                     Asst. Attorney General
Syracuse, New York 13204-2455

**Hon. Thomas J. McAvoy, Senior United States District Judge**

**<u>MEMORANDUM DECISION and ORDER</u>**

        Plaintiff brings this civil rights action pursuant to 42 U.S.C. ¶ 1983, challenging his

confinement in Involuntary Protective Custody while incarcerated at Auburn Correctional Facility

between late November of 2002 and the present. (Dkt. No. 85) (Second Amended Complaint)(AC).

Plaintiff also alleges that defendant Wright used excessive force against him in violation of the Eighth

Amendment.  Plaintiff appears to seek class certification. AC  ¶ 2.  Presently before the court is

defendants' motion for summary judgment pursuant to FED. R. CIV. P.  56. (Dkt. No. 97).  Plaintiff

has filed a response in opposition to the motion for summary judgment, but has also filed a motion for

voluntary dismissal of various claims and defendants contained in the amended complaint. (Dkt. Nos.

99-101).  For the following reasons, this court will allow plaintiff to withdraw the requested claims

and defendants, and will grant defendants' motion for summary judgment **in part**.[1]

## DISCUSSION

### 1.  Procedural History

Plaintiff originally filed this civil rights action against nineteen defendants. (Dkt. No. 1).  On November 2, 2006, plaintiff made a motion for class certification, and on November 30, 2006, plaintiff filed a motion to amend. (Dkt. Nos. 56, 72).  On February 7, 2007, this court granted plaintiff's motion to amend, but denied his motion for class certification.[2] (Dkt. No. 84).  The amended complaint named seventeen defendants. (Dkt. No. 85)(AC).  The amended complaint contained six causes of action, including failure to protect (Count One); double jeopardy in relation to an Involuntary Protective Custody (IPC) placement (Count Two); due process relating to the continuation of plaintiff's IPC placement (Count Three); due process relating to defendants' failure to transfer plaintiff (Count Four); various constitutional rights[3] relating to the conditions in IPC at Auburn (Count Five); and cruel and unusual punishment relating to an alleged use of excessive force by defendant Wright (Count Six). AC ¶¶ 147-53.

Defendants filed their motion for summary judgment on August 15, 2007. (Dkt. No. 97). Plaintiff filed his response and supplemental response on October 1, 2007. (Dkt. Nos. 99, 101).  In

---

[1] The parties are advised that the referral to the Magistrate Judge as provided for under Local Rule NDNY 72.3 has been rescinded.  Therefore, any appeal taken from this Order will be taken to the Court of Appeals for the Second Circuit.

[2] In plaintiff's amended complaint, he continues to state that he is "seeking class certification." AC ¶ 2. This court has already denied class certification, and plaintiff has made no showing that any of the circumstances have changed since this court's denial of the motion.  Thus, to the extent that plaintiff again seeks class certification, that motion is denied. *See* Dkt. No. 84 (order denying class certification).

[3] Plaintiff claimed that the restrictions in IPC violated his Eighth Amendment right to be free from cruel and unusual punishment; his First Amendment right to properly practice his religion; his Sixth Amendment right to access to courts; and his Fourteenth Amendment right to equal protection of the law. AC ¶ 151.  Plaintiff also mentioned his Fifth Amendment rights, but it is unclear to what facts plaintiff was associating a Fifth Amendment violation.

addition to these responses, plaintiff also filed a motion to voluntarily dismiss some of the claims and some of the defendants contained in the amended complaint. (Dkt. No. 100). In this motion for voluntary dismissal, plaintiff seeks to withdraw Counts One, Two, Four, and Five. (Dkt. No. 100). Plaintiff also consents to voluntary dismissal of the above claims as to defendants Glenn Goord; Lucien LeClaire; Richard Roy; Theresa Knapp-David; Donald Selsky; Joseph Giannotta; C. Barrette; Norman Austin; and Vince Konecny. (Dkt. No. 100).

In his opposition to defendants' motion, plaintiff also concedes that he cannot sustain his Eighth Amendment claim against defendants Goord, Burge, Bradt, Bellnier, Rourke, and Gummerson because plaintiff cannot establish the requisite personal involvement of these supervisory officials in the alleged assault. Plaintiff's Mem. of Law at 15 (Dkt. No. 99). Thus, the court will dismiss the Eighth Amendment claim (Count Six) as against all defendants except defendant Wright.

This court will grant plaintiff's motion to withdraw the above claims. Thus, remaining in this action are Counts Three and Six. Count Three alleges that the periodic review process for plaintiff's continued IPC placement was constitutionally insufficient. AC ¶¶ 67-82, 149. Count Six alleges that defendant Wright used excessive force against plaintiff. AC ¶¶ 130-46, 152. The remaining defendants are Goord (Count Three); LeClaire (Count Three); Selsky (Count Three); Burge (Count Three); Bradt (Count Three); Rourke (Count Three); Gummerson (Count Three); Kott (Count Three); Graham (Count Three); Bellnier (Count Three); and Wright (Count Six). The complaint will be dismissed in its entirety pursuant to plaintiff's motion for voluntary dismissal as against defendants Roy; Knapp-David; Giannotta; C. Barrette; Austin; and Konecny. Plaintiff has addressed his response to defendants motion for summary judgment only to the remaining claims and remaining defendants. (Dkt. Nos. 99, 101).

**2.**     **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving  party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

**3.**     **Facts**

Although plaintiff has agreed to dismiss many of his causes of action, this court will review all the facts for clarity because the remaining claims are related to the facts in their entirety.  Plaintiff states that on November 30, 2002, he was incarcerated at Auburn Correctional Facility. AC ¶ 22.  He concedes in his amended complaint that he had "unknown enemies" on the "C" and "D" Blocks at Auburn. AC ¶ 25.  Plaintiff has been classified as a "Central Monitoring Case" (CMC) inmate. AC ¶ 24; Seifert[4] Aff. ¶ 7.  CMC inmates are those who "by reason of their status, behavior, or nature of their crime, warrant additional scrutiny with respect to movement, placement and transportation." Seifert Aff. ¶ 4.  The rules governing CMC status are contained in both DOCS Directives and in New York State Regulations. Seifert Aff. ¶ 5 & Ex. 1; N.Y. COMP. CODES R. & REGS. tit. 7, § 1000 *et seq.*

It is undisputed that on November 30, 2002, at approximately 12:20 p.m., plaintiff was

---

[4] George W. Seifert, III is the Deputy Inspector General of the Department of Correctional Services (DOCS). Seifert Aff. ¶ 1.  He is not a defendant in this action, but has submitted an affidavit in support of defendants' motion for summary judgment.  His affidavit is contained in defendants' motion papers. (Dkt. No. 97).

stabbed three times by an unknown assailant. AC ¶ 35.  Plaintiff did not report his injuries,[5] but at

approximately 1:40 p.m. Corrections Officer (CO) Major discovered plaintiff bleeding in his cell.[6]

AC ¶ 39.  When questioned by CO Barrette, plaintiff would not or could not divulge the identity of

his attacker. Defendants' Ex. F (Schwartz Aff. Ex. A at pp.3, 6).  Plaintiff was examined by medical

personnel at Auburn, but then transported to an outside hospital for treatment. *Id* at p.3.   Plaintiff

remained at the hospital until December 1, 2002. Defendants' Ex. L at 2.

Upon plaintiff's return from the hospital, he was placed in the Special Housing Unit (SHU),

pending an Administrative Segregation (Ad Seg) hearing. *See* Defendants' Ex. A (Ad Seg

Recommendation).  Plaintiff states that the Ad Seg recommendation was denied because defendant

Gummerson "testified" that Ad Seg was not appropriate for the ***victim*** of an assault. AC ¶¶ 53-54.

However, former defendant Giannotta filed an alternative recommendation that plaintiff be placed in

IPC. Defendants' Ex. B (IPC Recommendation); Burge Decl. ¶ 14.  The main reason for the IPC

recommendation was that plaintiff was the victim of a serious assault and suffered serious injuries,

necessitating treatment at an outside hospital. Defendants' Ex. B.  The recommendation was also

based on the fact that the assailant was not found, and plaintiff could not or would not identify the

individual. *Id.*  Plaintiff refused to voluntarily sign into protective custody, and confidential

information had revealed that if plaintiff were placed back in general population, he would again be

---

[5] Plaintiff's failure to promptly report his injuries was subsequently the subject of disciplinary charges that are not being challenged in this action. Defendants' Ex. D at 1.

[6] This fact is supported by other exhibits in the file. Defendants' system of numbering the pages within exhibits has made it **very** difficult for the court to cite to facts contained therein.  Excerpts of plaintiff's deposition transcript have been included as Defendants' Exhibit C, but instead of numbering the pages in the exhibit, defendants have used the page number of the deposition transcript.  Thus, plaintiff testified that he was found in his cell by CO Major at p.21 of his deposition transcript.  Defendants' Ex. F contains the documents associated with the Article 78 proceeding, brought by plaintiff regarding his initial placement in IPC.  Defendants have not paginated the exhibit itself, rather they cite to exhibits within the Article 78 documents.  Therefore, the Unusual Incident Report and supporting memorandum, authored by CO Major is Defendants' Ex. F, (Schwartz Aff. Ex. A at pp.3, 8).

the subject of an attack. *Id.*   Finally, the recommendation stated that it was being made for plaintiff's own safety as well as the safety of "other inmates that you may assault in retaliation from this incident." *Id.*

Captain Rourke presided over the IPC hearing and affirmed the recommendation. Defendants' Ex. F[7] (Schwartz Aff. Ex. A at pp.14-17).   Captain Rourke based his determination on the need to protect plaintiff's safety as well as the safety of other unknown inmates. *Id.*   Plaintiff appealed this determination, claiming that he was denied the right to call witnesses, denied the ability to submit evidence, denied effective assistance, and denied an impartial hearing officer. AC ¶ 60.   The IPC determination was affirmed by defendant Selsky, and plaintiff commenced an Article 78 proceeding in Albany County Supreme Court, challenging the IPC determination. Defendants' Ex. E.  On July 22, 2003, Supreme Court Justice E. Michael Kavanaugh dismissed plaintiff's petition. Defendants' Ex. G.  Plaintiff appealed Justice Kavanaugh's decision to the Appellate Division, Third Department. The Appellate Division affirmed the dismissal of plaintiff's petition on October 28, 2004.[8] Defendants' Ex. H.

DOCS policy requires that an inmate's IPC status be reviewed every thirty days by a three-member committee, consisting of a representative of the facility's executive staff, a security supervisor, and a member of the guidance and counseling staff. Kott Aff. ¶¶ 4, 6 & Ex. 1 (DOCS

---

[7] Defendants have supplied exhibits that are attached to individual affidavits as well as a set of exhibits that are attached to counsel's affidavit.  The court will cite the exhibits that are attached to counsel's affidavit simply as "Defendants' Exhibits."

[8] The court notes that in plaintiff's amended complaint, he challenged his initial placement in IPC based on the same claims as he brought in the Albany County Article 78 proceeding.  Defendants' motion for summary judgment properly argued that plaintiff would be estopped in this action from challenging the individual findings of the state court, and his challenges to the initial IPC placement would be barred by collateral estoppel. Def. Mem. of Law at 9-11.  Plaintiff has now withdrawn this claim, together with the allegation that he was subjected to Double Jeopardy in the initial IPC determination because the Ad Seg determination was dismissed.  Thus, this court need not address these issues.

Directive 4948(III)(C)).  The IPC review committee must then prepare written findings that are forwarded to the facility superintendent for final determination. Kott Aff. ¶ 5 & Ex. 1 (DOCS Directive 4948(III)(C)).  Plaintiff is then informed of the committee's decision by memorandum. Kott Aff. Ex. 2.  Plaintiff's IPC status was reviewed weekly for the first two months that he was in IPC and then monthly thereafter by a three-member committee. Kott Aff. ¶ 7 & Ex. 2; Burge Decl. ¶ 15; Graham Aff. ¶ 7.  The "Memorandum" sent to plaintiff basically indicates the date of the review, that the circumstances of his placement in IPC had "[r]emained [t]he [s]ame," and that therefore, plaintiff would remain in IPC. Kott Aff. Ex. 2.  A review of all the memoranda included with the Kott affidavit shows that defendants Bradt, Bellnier, Rourke, Gummerson, and Kott have all at one time or another been members of the three-person committee. Kott Aff. Ex. 2.

Plaintiff does not dispute that he received these reviews, rather, plaintiff claims that the reviews that he received were insufficient because he was not afforded any due process procedures in connection with these periodic reviews (AC ¶ 75); there was insufficient review by the Superintendent of the facility (AC ¶¶ 77-78); there was no requirement that plaintiff receive written reasons for the determination (AC ¶¶ 72-74); and that defendants Rourke, Gummerson, and Bradt were not sufficiently impartial because they had been involved in plaintiff's initial placement in IPC (AC ¶ 80).

DOCS Directive 4948(III)(A) provides that inmates who are admitted to IPC will be evaluated and recommended for transfer to facilities where they may be appropriately placed in general population.  Defendants in this case state that on several occasions, requests have been made to transfer plaintiff, but these requests have been denied.[9] Kott Aff. ¶ 12; Seyfert Aff. ¶ 8.  Transfer

_____

[9] This court again notes that plaintiff's amended complaint originally challenged defendants failure to transfer him (Count 4), however, he has abandoned this claim as stated above.  The court is merely stating these facts as background and information for its decision on plaintiff's remaining claims.

requests are made to DOCS Classification and Movement Division. *Id.*  Transfer requests were

submitted for plaintiff on January 7, 2003; April 29, 2004; August 12, 2004;[10] August 23, 2005; and

September 13, 2006. Kott Aff. ¶¶ 13-16.  Because plaintiff is designated as a CMC inmate, the

transfer requests must be forwarded to the Inspector General's Office upon receipt. Knapp-David Aff.

¶¶ 5-6.  Deputy Inspector General Seyfert states that he reviewed and recommended denial of all of

the requests for plaintiff's transfer. Seyfert Aff. ¶ 8.

 Finally, plaintiff alleges that on July 18, 2004, he was involved in an altercation with Inmate

Rosales. AC ¶ 129.  Plaintiff alleges that when the corrections staff separated the inmates, "multiple

corrections officers" began to punch and kick plaintiff. AC ¶ 130.  Plaintiff states that while he was

"dazed and lying face down," he was handcuffed behind his back and frisked for contraband and

weapons. AC ¶ 132.  Plaintiff states that Sergeant Lavin ordered defendant Wright and CO Thomas to

escort plaintiff to the facility infirmary. AC ¶ 133.  Plaintiff claims that on the way to the infirmary,

while plaintiff was still handcuffed behind his back, defendant Wright struck plaintiff with "closed

fists" on the left side of plaintiff's face. AC ¶ 134.  Plaintiff states that as a result of this assault by

defendant Wright, he suffered a broken nose, a swollen and bruised face, and black eyes. *Id.*

 Plaintiff claims that he asked defendant Wright why he hit plaintiff, and Wright stated that he

did so because plaintiff filed a grievance against "staff" and that the next time plaintiff did so, he

would be killed. AC ¶ 135.  Plaintiff states that defendant Gummerson interviewed plaintiff regarding

the fight that plaintiff had with the other inmate, but that plaintiff did not report Wright's alleged

assault because defendant Wright threatened to beat plaintiff again if he reported the assault. AC

¶¶ 136-38.  Plaintiff claims that although he did not mention the assault to defendant Gummerson,

plaintiff did tell defendants Rourke and Sergeant Lavin, but that neither individual took disciplinary

---

[10] This was a resubmission of the April 2004 request because more information was needed. Kott Aff. ¶ 14.

action against defendant Wright. AC ¶ 138.  Plaintiff claims that he also told defendants Burge and Bradt about the assault. AC ¶ 139.  Plaintiff also claims that he told defendants Burge and Bradt that Officers Thomas and Lupo[11] witnessed the assault but did nothing to stop defendant Wright. *Id.*

Plaintiff states that he ultimately filed a grievance complaining about defendant Wright's excessive use of force. AC ¶ 140 & Ex. 9.  Plaintiff claims that defendant Burge investigated the alleged excessive use of force, but determined that defendant Wright's use of force was necessary. AC ¶ 141.  Plaintiff states that he also wrote to Investigator Stephen Kafka of the DOCS Inspector General's Office, complaining of the assault, but received no response. AC ¶ 142.  Plaintiff claims that the alleged assault by defendant Wright was in retaliation for plaintiff filing grievances and also racially motivated. AC ¶ 143.  Finally, plaintiff cryptically states that his Fifth Amendment rights were violated because he was assaulted and then disciplined for his involvement in the fight with Inmate Rosales. AC ¶ 144.

**4.**   **Due Process**

Plaintiff no longer challenges his placement in IPC, rather, he claims that the periodic reviews conducted by defendants were insufficient.[12]  In order to begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determine whether the defendants deprived plaintiff of that liberty interest

---

[11] Plaintiff has not named either Officer Thomas or Officer Lupo as defendants.

[12] As stated above, plaintiff has now withdrawn this claim.  In defendants' motion for summary judgment, they argued that any claim regarding plaintiff's placement in IPC would be barred by collateral estoppel because plaintiff brought the same claims in an Article 78 proceeding in the Albany County Court. Def. Mem. of Law at 9-11.  Plaintiff's Article 78 petition was dismissed by the County Court, and the dismissal was affirmed by the Appellate Division. Defendants' Ex. F.  Defendants were correct in their argument, and the court would have dismissed plaintiff's claims on that basis. *See Giakoumelos v. Coughlin*, 88 F.3d 56, 61 (2d Cir. 1996)(where the Second Circuit held that "[c]ollateral estoppel in a subsequent § 1983 action is one of the risks" attendant to the plaintiff's decision to challenge the disciplinary determination in an Article 78 proceeding).  Plaintiff did not challenge the periodic review process in the Article 78 proceeding and is, thus, not estopped from bring that due process claim.

without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996).  In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000).  In *Colon*, the court discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id.*  The court concluded that 305 days in SHU would meet the standard. *Id.* at 231.  Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id.* at 234.  The court also noted that the longest confinement in SHU that did ***not*** meet the atypical requirement was ***101 days***. *Id.*  at 231 (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90(2d Cir. 1999)).

There appears to be no question that plaintiff in this case has a liberty interest in remaining free from IPC.  He has been confined to IPC since December of 2002.[13]  Defendants concede for purposes of this motion that plaintiff has a liberty interest.  However, the existence of a liberty interest is only part of the due process analysis.  Once the court determines that a liberty interest exists, the court must also determine the degree of due process to which one is entitled.  In *Hewitt v.*

---

[13] Defendants state that during this time, plaintiff has occasionally been transferred to other locations for brief periods. *See* Defs. Mem. of Law at 5, n.1.  These transfers do not affect this court's decision.

*Helms*, 459 U.S. 460, 469-76 (1983), the Supreme Court held that when a liberty interest is created, an inmate must be afforded procedural protections prior to being transferred into the more restrictive confinement.[14]  Under *Hewitt*, an inmate placed in ***administrative*** segregation[15] must receive some notice of the charges and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate to administrative segregation. 459 U.S. at 476.

Prison officials must conduct an "informal nonadversary evidentiary review" of the information supporting the inmate's administrative segregation, and this review must take place within "a reasonable time following an inmates' transfer." *Id.* at 486 & n.8.  *Hewitt* also requires that there be periodic reviews after an inmate's placement in administrative segregation, such that the placement is not "a pretext" for indefinite confinement. *Id.* at 477.  A "pretextual" administrative confinement may be raised as a separate constitutional violation. *See Soto v. Walker*, 44 F.3d 169, 173 n.4 (2d Cir. 1995)(citing *Hewitt*, 459 U.S. at 477 n.9).  Thus, even though plaintiff in this case is no longer challenging his placement in IPC, he may bring a separate constitutional challenge to the adequacy of the periodic review.

The regulations governing admissions to IPC provide that an inmate in IPC status shall have that status "reviewed every 30 days by a three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff.  The

---

[14] Although the standard for determining whether a liberty interest is created is now governed by *Sandin*, rather than by *Hewitt*, the standard for determining the process that is due after a liberty interest has been created remains the same. *See Wilkinson v. Austin*, 545 U.S. 209, 229 (2005)(stating that although *Sandin* abrogated the methodology for establishing the liberty interest, articulated in *Hewitt* and in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1979), those cases "remain instructive for their discussion of the appropriate level of procedural safeguards"); *Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001)(stating that *Hewitt* was "qualified on other grounds by *Sandin*, but using the standard for determining due process articulated in *Hewitt*).

[15] IPC is a form of administrative or "non-disciplinary" confinement.  An IPC inmate is one who "may be a potential victim or a witness likely to be intimidated, or who lacks the ability to live in the general facility community and who may for good cause be restricted from communication with the general inmate population, and who does not voluntarily accept admission into protective custody status." N.Y. COMP. CODE RULES & REGS. § 330.2(b).

results of such review shall be forwarded, in writing, to the superintendent for final determination."
N.Y. CODE RULES & REGS. tit.7, § 330.3(b)(2).  In this case, plaintiff's IPC placement was reviewed
weekly for the first sixty days that he was confined to IPC and monthly thereafter. Kott Aff. ¶ 7 & Ex.
2.  Exhibit 2 of the Kott Affidavit contains all the review "memoranda" that were sent to the plaintiff
and the Superintendent for review.  Basically, the "memorandum" simply states that the
"circumstances" of plaintiff's status "Remained the Same" and therefore, he would "Remain in
Involuntary Protective Custody status." *Id.*  No further explanation was given in the memorandum.

Plaintiff was clearly aware of why he had been placed in IPC.  The IPC recommendation was
given to plaintiff and stated that plaintiff was the victim of a serious assault, his assailant was never
found, and plaintiff could not or would not identify the individual. Defendants' Ex. B.  The
recommendation further stated that reliable confidential information had been received indicating that
if plaintiff were to be returned to general population, he would again be the victim of an attack. *Id.*
Finally, the recommendation stated that facility officials were concerned that plaintiff would attempt
to retaliate against the individual who attacked him. *Id.*

Although the review memoranda themselves did nothing more than state that the
circumstances of his placement had not changed, it is clear that if plaintiff's attacker could not be
identified, it would have been impossible to know whether the attacker was still incarcerated at
Auburn or even in what cell-block he could be at any given time.  Thus, the fact that the
circumstances had not changed meant that the officials believed that plaintiff was still in danger.  The
court would also point out that although periodic reviews of Ad Seg status are required to contain
certain information, the same is ***not*** required for periodic reviews of IPC inmates. *Compare* N.Y.
CODE RULES & REGS. tit.7, § 330.3(b)(2) *with* N.Y. CODE RULES & REGS. tit.7, § 301.4(d).  The
review of Ad Seg inmates, however, is conducted every sixty days, while IPC inmates are reviewed

12

every thirty days. *Id.*

IPC inmates are also afforded more privileges and have less restrictions than Ad Seg inmates. In fact, conditions of IPC are governed by a lengthy regulation containing all the privileges to which they are entitled, while Ad Seg inmates are subject to the same restrictions as disciplinary SHU inmates who have completed thirty days of satisfactory adjustment. *Compare* N.Y. CODE RULES & REGS. tit.7, § 330.4 (conditions of confinement for IPC) *with* N.Y. CODE RULES & REGS. tit.7, § 301.4(d)(Ad Seg). *See also Choice v. Coughlin*, 94 Civ. 8307, 1996 U.S. Dist. LEXIS 8069, *29-31 (S.D.N.Y. June 11, 1996)(discussing the difference between Ad Seg and IPC). The fact that there are more restrictions in Ad Seg may be one of the reasons that the requirements for periodic review are more stringent that those for IPC. This is also the reason that plaintiff's Ad Seg hearing was dismissed, and he was then scheduled for IPC placement. Plaintiff himself stated in his amended complaint that defendant Gummerson stated that as the "victim" of the assault, plaintiff would not be appropriately placed in Ad Seg. AC ¶ 53.

The severity of restrictions governs not only the determination of the existence of a liberty interest, but also the degree of due process protections. *Sandin, supra. Hewitt, supra.* Although plaintiff was initially placed in a Special Housing Unit, it is clear that IPC is ***not*** a disciplinary unit, and the Hearing Officer noted this at the IPC hearing. Defendants' Ex. F, Transcript of IPC Hearing at 7.[16] Plaintiff would have been placed in the IPC Unit after the hearing. Defendants have also submitted the Rules and Regulations for the IPC Unit as Exhibit M. A review of these rules shows that many of the privileges accorded to general population inmates are also accorded to IPC inmates, albeit in a separate part of the facility. *See* Defendants' Ex. M at ¶¶ 3 (Correspondence procedure is

---

[16] This transcript was attached to the state court Article 78 papers submitted by the Attorney General's Office. This transcript was attached to the Attorney General's Answer as Exhibit B. In this proceeding, defendants have attached these documents to Exhibit F.

the same as general population); 4 (IPC inmates are allowed package privileges); 5 (IPC inmates may

eat their meals on the gallery, outside of their cells); 21 (IPC inmates are allowed all of their

property); 22 (Commissary privileges are "similar to those of general population)(Policy Procedure

Memorandum).

The court would also point out that IPC inmates are automatically evaluated and

recommended for transfer to another facility[17] in which they can be "appropriately programmed in

general population." N.Y. CODE RULES & REGS. tit.7, § 330.3. DOCS policy under this section is to

try to keep an individual in IPC for as little time as possible. The record is clear that plaintiff's

transfer was requested at least four times, but he was unable to be transferred due to his CMC status,

his escape risk, and the fact that he had thirty six enemies on the list of inmates from which plaintiff

had to be separated.[18] Kott Aff. ¶¶ 12-16; Seyfert Aff. ¶¶ 10-13. According to Deputy Inspector

General Seyfert, because of plaintiff's extensive enemy list, his escape risk,[19] and his high security

status, the facilities to which transfer is appropriate are very limited. Seyfert Aff. ¶¶ 10-13.

Defendant Kott states in his affidavit that some of the factors considered by the IPC review

committee were the serious assault that caused plaintiff's placement in IPC in the first instance; the

failure to identify plaintiff's attacker; plaintiff's own statements to defendant Kott that plaintiff would

seek revenge on those responsible for the attack; the assault on another IPC inmate committed by

---

[17] Plaintiff in this case no longer challenges defendants' failure to transfer him to another facility. The court
is mentioning mandatory request for transfer in relation to the adequacy of the periodic review of IPC status.

[18] In plaintiff's opposition to defendants' motion, he has misread defendants' statement. Plaintiff's Mem. at
9. Plaintiff argues that defendants' statement about plaintiff's thirty six enemies is unfounded because he could not
have made thirty six enemies while confined in IPC. Plaintiff seems to think that defendants are stating that he has
thirty six known enemies while confined in IPC. That is not what defendants state. The thirty six
known enemies are throughout DOCS, and "[a]t least *one* of the inmates on plaintiff's separatee list is in the general
population at Auburn." Seyfert Aff. ¶ 12.

[19] Deputy Inspector General Seyfert states that on November 2, 1995 plaintiff attempted to escape from
Great Meadow Correctional Facility, and in 1981, he successfully escaped from Mid-Hudson Psychiatric Hospital.
Seyfert Aff. ¶ 11 & Ex. 2.

plaintiff on July 18, 2004; and the significant number of known enemies throughout the prison system. Kott Aff. ¶ 11.  Finally, defendant Kott states that in his capacity as the protective custody correctional counselor, he visited plaintiff "weekly" since January 2003.[20] Kott Aff. ¶ 8.  Defendant Kott states that "[o]n several occasions, the plaintiff has expressed his desire to be transferred to the general population so he can 'do what a man needs to do.'" *Id.*  Defendant Kott has interpreted that statement as plaintiff indicating that he would like to be sent back to general population so that he can seek revenge for the November 30, 2002 assault. *Id.*

Plaintiff was deposed in this case on November 13, 2006. Defendants' Ex. C[21] (Deposition Transcript)(T)).  Plaintiff testified that the November 30, 2002 assault "happened so fast . . . I couldn't identify him." (T. 19).  Defense counsel then asked plaintiff how he was going to know "who to get even with". *Id.*  Plaintiff stated that "I knew the people, more or less, I suspected of having something to do with me being stabbed, okay.  So if I couldn't get him, I'm going to get anyone in his crew.  That's how you live in prison." *Id.*  This statement by plaintiff is completely consistent with defendant Kott's interpretation of plaintiff's statement that he was going to "do what a man needs to do" if he was released into general population.

Plaintiff claims that the review committee was not impartial because some of them were involved in his initial placement in IPC.  An inmate is entitled to a decision-maker who does not "prejudge the evidence and who cannot say . . . how he would assess evidence he has not seen yet." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996)(citing *inter alia Patterson v. Coughlin*, 905 F.2d

---

[20] Although plaintiff claims that no one ever came to speak with him in five years, defendant Kott states that he was on the Unit "weekly" and met with plaintiff. Plaintiff's Mem. at 7; Kott Aff. ¶ 8.  Defendant Kott's statement is supported by the Rules and Regulations of the IPC Unit which state that "a counselor is on the unit once per week," and "[i]nquiry slips can be sent to a counselor through the facility mail." Defendants' Ex. M ¶ 11.

[21] Defendants' Ex. C contains only excerpts of plaintiff's deposition, and the pages of the exhibit are not sequentially numbered.  Thus, the court will cite to the deposition transcript page number.

564, 570 (2d Cir. 1990)); *Tellier v. Scott*, 94 Civ. 3459, 2004 U.S. Dist. LEXIS 1493, *24 (S.D.N.Y. Feb. 5, 2004)(citations omitted).  The requirements of due process, however, are flexible and may vary depending upon the particular situation. *Id.* (citations omitted).  Prison hearing officers "are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *inter alia Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1994)).

In this case, plaintiff alleges that because defendants Bradt, Rourke, and Gummerson were involved in plaintiff's initial placement in IPC, they should not have been involved in his periodic reviews. AC ¶¶ 69, 80.  Plaintiff claims that Rourke took pictures of plaintiff after the November 30, 2002 assault and was the hearing officer for the IPC hearing.  AC ¶ 47, 70.   Plaintiff claims that defendant Gummerson asked plaintiff if he could identify his attacker. AC ¶ 47.  Plaintiff alleges that defendant Bradt "endorsed" the IPC recommendation. AC ¶ 70.  A review of plaintiff's IPC recommendation shows that defendant Giannotta wrote the recommendation, and the only "endorsement" by defendant Bradt was to authorize plaintiff's confinement pending the recommendation. Defendants' Ex. B.  He was not "endorsing" the recommendation.

Plaintiff has not alleged any reason why these individuals, particularly defendant Bradt would have had a "conflict of interest" or would not have impartially reviewed plaintiff's IPC status.  In addition, there were three members of the review committee, and defendant Kott almost always sat as the third member of the committee.[22]  Kott Aff. Ex. 2.  The fact that defendant Rourke was the IPC hearing officer does not indicate that later review of the facts of plaintiff's case would not be impartial.  There is no indication that the periodic reviews were not impartial.

---

[22] As stated above, a member of the counseling staff was required to sit as one of the members of the committee.  Defendant Kott sat on all but approximately twelve of the review committees.  When defendant Kott was not there, another individual from the counseling staff, who is not a defendant in this case was part of the committee. *See e.g.* Kott Aff. Ex. 2 at pp.11-12 (unnumbered pages).

It is true that after the reviews, plaintiff received only a short memorandum indicating that his circumstances had not changed, and his IPC status was being continued. Kott Aff. Ex.2. These memoranda do not contain further specific reasons. The lack of specificity in the memoranda does **not** mean that the **review** of his IPC status was insufficient. Although *Hewitt* requires "some sort of periodic review," there is no constitutional requirement that officials permit the submission of additional evidence. Plaintiff is not required to have the dates of the reviews **or** the specific decision. *Giano v. Kelly*, 869 F. Supp. 143, 150 (W.D.N.Y. 1994). *Giano* also held, however, that prison officials must be prepared to offer evidence that the periodic reviews are substantive and legitimate. *Id.*

In this case, it is clear from the affidavits submitted that plaintiff's case was carefully considered, and his transfer was requested at least **four** times, but the substantial number of enemies in other facilities and his security status prevented these transfers. Defendant Kott states that in his capacity as corrections counselor, he visits inmates in their cells. Kott Aff. ¶ 8. Defendant Kott states that since January of 2003, he has had "**weekly counseling meetings with the plaintiff.**" *Id.* Clearly, during these meetings, that lasted between five to twenty minutes, plaintiff had the opportunity to express his opinion about his confinement to IPC and to discuss the reasons for his continued placement. It is during "several" of these meetings that plaintiff expressed to defendant Kott that he wanted to be released to general population so that he could "do what a man needs to do." *Id.*

In *Giano*, the court mentioned that the plaintiff could have been informed of the dates and "results" of his reviews. 869 F. Supp. at 151. The court also stated that plaintiff could have been informed of "what he needed to do to effectuate his efforts toward positive adjustment" and at a certain point, he could have been given the opportunity to present information showing that **he** was no longer a threat to the facility. *Id.* The court must point out that an Ad Seg determination is **not** the

17

same as an IPC determination.  In an Ad Seg case, generally, it is the inmate's behavior that causes the facility threat, however, in an IPC case, it is the inmate who is the potential victim, and his ability to be released into general population is not always completely based on *his adjustment or behavior*. *See Choice v. Coughlin*, 1996 U.S. Dist. LEXIS 8069 at *29-30.

 Plaintiff in this case was the victim, and the first claim in his amended complaint was that defendants had failed to ***protect*** him from unknown enemies of which he became aware, resulting in the November 30, 2002 assault.[23]  Plaintiff apparently disagrees with the defendants' method of protection.  Plaintiff's statement that defendants did "nothing" for five years is simply unsupported. The length of time that plaintiff has been in IPC is due to the fact that defendants have been ***unable*** to transfer him.  The first transfer request was placed for plaintiff on January 7, 2003, only ***four days*** after the IPC hearing concluded.  As stated above, because plaintiff is a CMC inmate, his transfers must be approved by the DOCS Central Office staff. Seyfert Aff. ¶ 6.  Deputy Inspector General Seyfert himself has reviewed the four requests for plaintiff's transfer and has made the recommendation that they be denied. *Id.* ¶¶ 8-9.  It is still Deputy Inspector General Seyfert's opinion that plaintiff may not be transferred based on plaintiff's known enemies, his CMC status, his escape attempt history, and his violent conduct even since he has been placed in IPC. *Id.* ¶¶ 14-15.

 In arguing that the reviews were insufficient, plaintiff argues that defendants should not be able to ***now*** rely on the 2002 assault because defendants "made no effort to ascertain information from either the victim or from an independent investigation." Plaintiff's Mem. at 7-8.  The court must point out that plaintiff ***refused*** to assist officials in determining who attacked him, notwithstanding his own statements at his deposition that he "knew the people" and suspected who might be responsible for attacking him. (T. 19).  Plaintiff even stated at his deposition that he did not report the

---

[23] As stated above, plaintiff has now withdrawn this claim.

incident immediately and hid his injuries because he "wanted to get even." *Id.*  In the documents submitted in conjunction with the Article 78 proceeding, there is a memorandum from Sergeant Barrette to Lieutenant Ashby, stating that on the day of the assault, plaintiff "had no information to offer." Defendants' Ex. F.[24]  Sergeant Barrette also stated that he spoke with several inmates who were housed on plaintiff's company, but "none of these inmates offered any information." *Id.* Plaintiff stated during his IPC hearing that he knew that he had an "extensive enemy history." Defendants' Ex. F, IPC Hearing Transcript at 14.[25]

Thus, this court finds that the reviews conducted by defendants in this case comported with due process.  This case is distinguishable from *Giano*, in which the court found that he could have been informed of the dates and results of the reviews, he could have been informed of what he needed to do to effectuate his efforts toward positive adjustment, and after a specified period of time, he could have been given the opportunity to show he was no longer a danger to the facility. 869 F. Supp. at 151.  Plaintiff in this case knew the dates and results of the reviews.  Even though the memoranda were cursory, he knew that defendants believed that the circumstances justifying IPC had not changed.  Plaintiff has admitted that he knew he had enemies at Auburn and elsewhere.  Plaintiff was the victim, thus, his "adjustment" was not an issue, and he was afforded greater privileges that an inmate who was assigned to Ad Seg.  Defendant Kott states that he saw plaintiff weekly, and that several times, plaintiff expressed a desire to be transferred into general population to obtain some sort of revenge against the person who assaulted him.  Finally, it is clear that defendants followed the rules and regulations by attempting to transfer plaintiff as soon as possible and continued to attempt

---

[24] This memorandum is on page 6 of Exhibit A of the Assistant Attorney General's Answer in the plaintiff's Article 78 proceeding, attached to Defendants' Ex. F.

[25] This transcript is attached to the Assistant Attorney General's Answer in the Article 78 proceeding as Exhibit B.

to have him transferred, but were simply unable to do so, in part because of his CMC status. Plaintiff's due process claims regarding his continued placement in IPC are, therefore, dismissed.

**5.**    **Excessive Force**

Plaintiff's last cause of action claims that defendant Wright used excessive force on plaintiff during and after the July 18, 2004 incident in which plaintiff had an altercation with another inmate in IPC.  Defendants argue for dismissal of this claim based solely upon plaintiff's failure to exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).  This court does not agree with defendants and will therefore deny their motion to dismiss plaintiff's excessive force claim.

The PLRA exhaustion requirement applies to ***all inmate suits about prison life***, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004).  In *Woodford v. Ngo*, 126 S. Ct. 2378 (2006), the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Id.* at 2387.  "Proper" exhaustion means that the inmate must complete the administrative review process ***in accordance with the applicable procedural rules***, including deadlines, as a prerequisite to bringing suit in federal court. *See id.* at 2385-93 (emphasis added).

The Supreme Court cited *Woodford* in *Jones v. Bock*, explaining that the holding in *Woodford* only imposed a requirement that in order to properly exhaust administrative remedies, the inmate must "'complete the administrative review process in accordance with the applicable procedural rules.'" *Jones*, 127 S. Ct. 910, 922 (2007)(citing *Woodford*, 126 S. Ct. at 2384).  These rules are defined by the prison grievance process itself, and not by the PLRA. *Id.*  In *Jones*, the Court ultimately held that exhaustion was ***not*** *per se* inadequate simply because a defendant that was later

20

named in the civil rights complaint was not named in the grievance. *Id.* at 923.  Compliance with prison grievance procedures is all that is required by the PLRA for "proper" exhaustion. *Id.* at 923.

New York State provides inmates with a grievance procedure to follow by which inmates may file complaints and appeal adverse decisions. N.Y. CORRECT. LAW § 139; N.Y. COMP. CODES R. & REGS. tit. 7 §§ 701.1 *et seq.* (NYCRR).  The regular Inmate Grievance Program (IGP) consists of a three-tiered process. *Hemphill v. State of New York*, 380 F.3d 680, 682 (2d Cir. 2004).  The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). *Id.* §§ 701.5(a)(1) and (b).[26]  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d).  Time deadlines apply at all levels of the process, but exceptions to any of the deadlines may be made based on "mitigating circumstances." *Id.* §§ 701.5(a)(1); 701.6(g).  An inmate must appeal any denial of his grievance to the highest available administrative level. *Martinez v. Williams*, 349 F. Supp. 2d 677, 682 (S.D.N.Y. 2004).

There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8.  Under this procedure, the inmate may (but is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.8(a).  The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id.* § 701.8(b).  Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house", by the

---

[26] The court notes that the sections governing inmate grievances were re-numbered in 2006.  This court will refer to the current numbering which is different than the numbers that appear in *Hemphill*.

Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* §§ 701.8(c); 701.8(d)(1)-(d)(3).  An appeal of the adverse decision of the Superintendent may be taken to the CORC as in the regular grievance procedure. *Id.* § 701.8(h).  A similar "special" procedure is provided for claims of discrimination against an inmate. *Id.* § 701.9.

In this case, defendants concede that plaintiff filed two grievances regarding the July 18, 2004 incident. Def. Mem. of Law at 28.  Defendants claim, however, that one of the grievances dealt with plaintiff's hearing aids, and the other did not name defendant Wright as the staff member who assaulted plaintiff. *Id.*  Defendants have submitted both of plaintiff's grievances as Exhibit I. Although the first grievance, AUB43086-04, requested hearing aids, plaintiff did state that he had been beaten by staff during the July 18, 2004 incident. Defendants' Ex. I at pp.1-11.  Plaintiff was given the opportunity to file a second (late) grievance, AUB45413-05.  In the second grievance, plaintiff alleged that he was punched in the nose while handcuffed behind his back by a "corrections employee" after the "razor fight." Defendants' Ex. I at p.12.

The Superintendent's designee denied the grievance because plaintiff had no witnesses and would not identify the officer. *Id.* at p.13.  In his appeal of the grievance, plaintiff stated that "staff knows who assaulted the grievant," and he stood by his complaint. *Id.*  The CORC denied plaintiff's appeal, stating that "the facility administration has conducted a proper investigation and that the *employees in question have gone on record to deny grievant's allegations*." *Id.* at p.14.  The court does note that defendant Wright was not mentioned in the Use of Force Report. Defendants' Ex. J at pp.4-6.  However, it is clear that plaintiff raised the issue of his assault in a grievance and appealed it to the highest level.

Under *Jones*, the Supreme Court has specifically held that an inmate is not subject to a "name all defendants requirement" under the PLRA. 127 S. Ct. at 922.  The court must look to the particular

22

state's grievance procedure. *Id.* In *Varela v. Demmon*, 491 F. Supp. 442, 449 (S.D.N.Y. 2007), the court examined the New York State grievance procedures and determined that New York's procedures make no mention of naming particular officials as a prerequisite to proper exhaustion. *Id.* (citing 7 N.Y.C.R.R. § 701.5(a)(2)).  Thus, the fact that plaintiff did not mention defendant Wright in the grievance may not be the basis for a dismissal for failure to exhaust administrative remedies.

Although defendants mention in passing that the records do not show that defendant Wright was even involved in this incident, that is a separate basis for dismissal.  Without more, however, defendant Wright's apparent lack of involvement cannot be the basis for dismissal when defendants' main argument fails.  Plaintiff's remaining claim in this action is **Count Six** (excessive force) **only as against defendant Wright**.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to withdraw Count One, Count Two, Count Four, Count Five, and any claims against defendants in their official capacity (Dkt. No. 100) is **GRANTED**, and it is

**ORDERED**, that plaintiff's motion to withdraw all defendants associated with Counts One, Two, Four, and Five (Dkt. No. 100) is **GRANTED**, and those Counts are dismissed as against defendants **GOORD, LECLAIRE, ROY, KNAPP-DAVID, SELSKY, GIANOTTA, BARRETTE, AUSTIN, and KONECNY**, and it is

**ORDERED,** that plaintiff's request to dismiss Count Six as to defendants **GOORD, BURGE, BRADT, BELLNIER, ROURKE, and GUMMERSON** (contained in Dkt. No. 99 at p.15) is **GRANTED**, and it is

**ORDERED,** that defendants' motion for summary judgment (Dkt. No. 97) is **GRANTED IN PART**, and plaintiff's **COUNT THREE IS DISMISSED IN ITS ENTIRETY AS AGAINST ALL**

23

**DEFENDANTS**, and it is further

ORDERED, that defendants' motion for summary judgment (Dkt. No. 97) is **DENIED IN PART**, insofar as it requests dismissal of Count Six as against **DEFENDANT WRIGHT.**

Dated: March 19, 2008

Thomas J. McAvoy
Senior, U.S. District Judge